KENNADAY LEAVITT PC
TROY R. SZABO (SBN 219387)
tszabo@kennadayleavitt.com
PATRICK S. FOSTER (SBN 261888)
pfoster@kennadayleavitt.com
COREY D. MCCARTHY (SBN 258636)
cmccarthy@kennadayleavitt.com
KALEIGH J ADAMS (SBN 365154)
kadams@kennadayleavitt.com
400 Capitol Mall, Suite 2840
Sacramento, California 95814
Telephone: (916) 732-3060

Attorneys for Plaintiff
KERN HEALTH SYSTEMS, INC.

BROWN LAW APC
LESTER O. BROWN (SBN 160828)
lbrown@brownlawapc.com
1120 Forest Avenue, PMB 298
Pacific Grove, CA 93950
Telephone: (213) 716-0542

Attorney for Plaintiff
KERN HEALTH SYSTEMS, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA - BAKERSFIELD DIVISION

KERN HEALTH SYSTEMS, INC.,

Plaintiff,

v.

ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES, LLC, an Illinois limited liability company; and PHYSICIANS INSURANCE, a mutual company

Defendants.

Case No.:

**COMPLAINT FOR:**

1. **PROFESSIONAL NEGLIGENCE**
2. **BREACH OF CONTRACT**
3. **BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**
4. **BREACH OF WRITTEN CONTRACT**
5. **DECLARATORY RELIEF**

**DEMAND FOR JURY TRIAL**

/ / /

/ / /

/ / /

Plaintiff KERN HEALTH SYSTEMS, INC. alleges upon personal knowledge and upon information and belief, the following causes of action against Defendants ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES, LLC, and PHYSICIANS INSURANCE, as follows:

**PARTIES AND VENUE**

1. Plaintiff KERN HEALTH SYSTEMS, INC. ("KERN") is a public agency established as a county health authority to meet the needs of low-income families and individuals in Kern County, California. KERN is, and at all relevant times has been, a citizen of the State of California with its principal place of business in Bakersfield, California. KERN is licensed to operate health care service plans pursuant to the Knox-Keene Health Care Service Act of 1975.

2. KERN is informed and believes, and based thereon alleges, that Defendant ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES, LLC ("GALLAGHER") is, and at all times was, a citizen of the State of Delaware with its principal place of business in Rolling Meadows, Illinois. GALLAGHER is duly authorized to do business and transacts business in the State of California.

3. KERN is informed and believes, and based thereon alleges, that Defendant PHYSICIANS INSURANCE ("PHYSICIANS") is a mutual insurance company. It is, and at all times was, a citizen of the State of Washington with its principal place of business in Seattle, Washington. PHYSICIANS is duly authorized to do business and transacts business in the State of California. PHYSICIANS sold KERN Reinsurance Agreement Number PIH1003-24 to cover its excess-of-loss reinsurance claims for the period January 1, 2024, through December 31, 2024 (the "PHYSICIANS Policy" or alternatively the "Policy"). A copy of the PHYSICIANS Policy is attached as **Exhibit A**.

4. Defendants GALLAGHER and PHYSICIANS shall be collectively referred to as "DEFENDANTS."

5. KERN is informed and believes that jurisdiction and venue are proper in this Court and this Division based on subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1332. KERN and DEFENDANTS have complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest, attorney's fees, and costs. Venue is also proper in the Eastern District of California, Bakersfield Division, pursuant to 28 U.S.C. section 1391(a), (b)(2), and (c)(2) because a substantial part of the events giving rise to this action occurred in this judicial district.

**GENERAL ALLEGATIONS**

6. In 2016, GALLAGHER began soliciting KERN's business. When marketing its services to KERN, GALLAGHER held itself out as providing "an unparalleled level of sophisticated solutions to help keep pace with the evolution of healthcare reform" and having a "comprehensive approach to risk analysis, benefit solutions, and coverage options." GALLAGHER further stated that, "Our team is also recognized as a licensed reinsurance intermediary, which allows us to provide seamless transactions for our clients." GALLAGHER also made the following representations to KERN to obtain its business:

> *"[GALLAGHER] provides boutique services on…provider stop loss and HMO Reinsurance clients."*
>
> *"We assemble a team that specifically works on your account…That team consists of a DATA analyst, a CLAIMS supervisor, and an APPEALS coordinator."*
>
> *"We have been doing it for over 15 years" and "we have a lot of happy clients as a result of providing these services."*
>
> *"We have a unique set of services that we offer that are not available in the stop loss industry that we provide to our customers at no charge."*
>
> *"We audit the claim, and on a line-by-line basis indicate whether we agree with the carrier or disagree and need to file an appeal…For charges upon which we disagree, we will file appeals to the carrier on your behalf."*
>
> *"HMO reinsurance is unique and requires specialization and services to deliver best possible NET cost on your reinsurance policy. By being your stop loss back office on recoveries and marketing, we can help you deliver these results to your [providers] and free you up to do other things that you do best."*

7. From 2016 until 2025, KERN retained GALLAGHER as its reinsurance broker. GALLAGHER's responsibilities to provide reinsurance brokerage services ("GALLAGHER Reinsurance Broker Agreement") included: (1) advising KERN on the "stop loss"/excess-of-loss reinsurance coverage available in the market and procuring the reinsurance necessary to meet KERN's needs; and (2) conducting claims-handling services, such as submission of claims, review of claims decisions, and appealing claims decisions as necessary. These services extended to claims processed on KERN's behalf by any reinsurance companies and/or their claims administrator. Under the GALLAGHER Reinsurance Broker Agreement, KERN did not pay for reinsurance brokerage services directly; instead, any insurance company that GALLAGHER successfully procured on KERN's behalf would pay a commission to compensate GALLAGHER.

8. PHYSICIANS used the Insurance Office of America Re, LLC ("IOA") as its claims administrator for claims submitted by GALLAGHER on behalf of KERN.

9. In the years 2023 and 2024, KERN submitted over $650 million in claims to GALLAGHER for transmission to reinsurers. KERN's total claims under the various federal and state programs totaled over $2.3 billion. GALLAGHER was responsible for communicating with the reinsurers and their agents to ensure full coverage for KERN. GALLAGHER's responsibility was to request, on KERN's behalf, coverage for qualified claims from the reinsurers based on the applicable services as coded and amounts that exceeded the deductible for each member once the program-wide deductible was exceeded. GALLAGHER was also responsible for auditing the reinsurers' claims determinations to ensure that the reinsurers' responses corresponded with the wording of the policies involved.

10. In 2024, GALLAGHER assisted KERN with acquiring excess-of-loss reinsurance coverage by soliciting services from PHYSICIANS, resulting in the Reinsurance Agreement ("PHYSICIANS Policy" or "the Policy") effective during the January 1, 2024, through December 31, 2024, time period. An excess-of-loss reinsurance arrangement in the managed care space is intended to protect managed care companies, like KERN, from unexpected high-dollar claims that might otherwise threaten their financial stability and/or viability.

11. KERN paid GALLAGHER a "monthly premium per member" (often referred to as "per member per month") which was then sent to PHYSICIANS. In turn, PHYSICIANS undertook a contractual obligation to indemnify KERN for losses exceeding specified retentions (or "attachment points"). The Policy specified the attachment points applicable to all insured and reinsured members and also identified certain members to whom an elevated attachment point applied.

12. Long Term Acute Care ("LTAC") services are defined in part as, "Comprehensive services for a Member who is a registered inpatient requiring specialized, complex services …" And "Long Term Acute Care Hospital(s)" ("LTACH") are facilities "licensed by the State as an LTACH."

13. The Kindred Hospitals ("Kindred"), approved KERN providers, performed LTAC services in the 2024 policy year and were a licensed LTACH in that year.

14. GALLAGHER agreed to not only submit the claims to the reinsurers as a service to KERN, but also to audit and comment on the nature of the claims submitted to the reinsurers.

GALLAGHER submitted the 2024 claims to PHYSICIANS through PHYSICIANS's agent, IOA. With regard to those claims submitted to PHYSICIANS in the 2024 policy year, GALLAGHER, without authorization from KERN, stated in its comments that all the Kindred claims submitted were "Rehab" and "Not Covered," even though they were for LTAC services.

15. Under the PHYSICIANS Policy, all properly coded LTAC claims that exceed the deductibles are covered.

16. In late 2024, KERN became dissatisfied with GALLAGHER's services and retained a new reinsurance broker for reinsurance brokerage services ("New Reinsurance Broker Agreement") for the January 1, 2025, through December 31, 2026, time period. Despite the change in reinsurance brokers, GALLAGHER remained responsible for processing claims under Section 8.3 ("Termination of Rights" provision) of the PHYSICIANS Policy for covered services rendered between January 1, 2024, and December 31, 2024.

17. Using its new reinsurance broker, KERN procured an excess-of-loss reinsurance policy ("2025 Policy") for the January 1, 2025, through December 31, 2025, time period. KERN's new excess-of-loss reinsurer paid all claims for LTAC services rendered exceeding the applicable deductible or attachment point. These claims included those for services rendered by Kindred.

18. In the spring of 2025, a GALLAGHER representative contacted KERN's new reinsurance broker to question the payment of the Kindred LTAC claims covered under the new excess-of-loss reinsurance policy. Upon information and belief, the GALLAGHER representative suggested that the Kindred LTAC claims paid by the new excess-of-loss reinsurance company might need to be rescinded.

19. As a result of this communication, KERN and its new reinsurance broker conducted an audit of Kindred LTAC claims submitted by GALLAGHER that were denied. The audit revealed that more than $7,600,000 of Kindred claims submitted by GALLAGHER to PHYSICIANS were denied. A review of the PHYSICIANS Policy indicated that the services involved should have been covered.

20. After its audit, KERN contacted GALLAGHER to obtain an explanation for the denied Kindred LTAC claims. GALLAGHER stated that at some time in the past, someone at KERN allegedly informed GALLAGHER that Kindred provided "Rehab" services. GALLAGHER stated that, when it solicited and priced the PHYSICIANS Policy, it informed PHYSICIANS that Kindred provided "Rehab"

services and that those claims were not covered, even though no coding supported that assertion. Thus, PHYSICIANS refused to cover the Kindred LTAC claims. GALLAGHER alleged that, as a result of its representations to PHYSICIANS, KERN's premiums were less than if the Kindred claims were covered under the PHYSICIANS Policy.

21. In a January 2022 email first made known to KERN by PHYSICIANS counsel in January 2026, a representative of IOA Re requested information and clarification from GALLAGHER about a major claim submitted resulting from LTAC services provided by a Kindred Hospital. Without investigation or consulting with KERN, GALLAGHER advised IOA that Kindred was a "Rehab" facility and therefore Kindred's services were "Rehab" and thus "not covered" under the Policy. In this exchange, the IOA representative, Sheri Barry, asked the following question regarding a Kindred claim at issue:

> *"MEM0170216-this member has been confined in a Kindred facility for 127 days. What is the prognosis and current status? Do we know what the contracted rate is for this facility?"*

In a follow-up email a few hours later, before GALLAGHER responded, the IOA representative added:

> "*Hi- Kindred can also be LTAC. I am fine if we all agree that Kindred is not covered, otherwise, I will need an update.*"

GALLAGHER's representative responded with the following:

> " *Kindred is a Rehab facility and Rehab is not covered. Do you still need this information.*"

22. GALLAGHER maintained this position even after IOA Re noted that Kindred may be considered an LTAC facility and thus the claims for LTAC services would be covered under the Policy.

23. GALLAGHER's representative wrongfully directed IOA staff to deny coverage for this LTAC claim from Kindred. However, GALLAGHER did not: (1) advise and inform KERN of this communication; (2) obtain KERN's confirmation and agreement on how to respond to IOA's inquiry; (3) inform KERN of its advice to IOA that Kindred services were "not covered" because they were "Rehab"; and (4) obtain KERN's authorization to make such a coverage representation at that time.

24. At no point prior to entering the PHYSICIANS Policy, during its execution, or after, did GALLAGHER provide KERN with the sum and substance of the apparent representation(s) it made to PHYSICIANS that all Kindred LTAC claims were not covered, nor did KERN authorize those representations, which were incorrect. Thus, until contacting GALLAGHER following its audit in spring

of 2025, KERN was unaware that GALLAGHER had made such representations to PHYSICIANS about the Kindred LTAC claims while procuring the PHYSICIANS Policy. KERN would have objected if so informed. After learning of the alleged representations, KERN reminded GALLAGHER that Kindred provided LTAC services. KERN also reiterated to GALLAGHER that LTAC services submitted by Kindred were indeed covered services, not "Rehab" services, and that the service coding did not indicate those claims were for "Rehab" services.

25. Section 6.6 of the PHYSICIANS Policy requires that any appeal of a denial of coverage must be undertaken within two (2) years after receipt of a claim determination. Throughout the summer and fall of 2025, KERN properly and timely filed an appeal for payment of over $7,600,000 in covered Kindred LTAC claims. KERN informed GALLAGHER that GALLAGHER was required to notify PHYSICIANS of KERN's appeal of PHYSICIANS's coverage position due to GALLAGHER's mistaken representations regarding the Kindred LTAC claims. KERN, directly and through counsel, requested that GALLAGHER assist in the appeal process. GALLAGHER resisted. For some time, KERN was concerned that GALLAGHER would not agree to submit KERN's appeal because GALLAGHER did not respond.

26. Although GALLAGHER ultimately forwarded KERN's appeal to PHYSICIANS, it refused to engage in discussions with KERN about compensation alternatives if the PHYSICIANS appeal was unsuccessful. KERN's counsel wrote and called GALLAGHER's account executive, but GALLAGHER's account executive failed to respond.

27. KERN sent a letter dated November 13, 2025, to PHYSICIANS to appeal PHYSICIANS's claim determination and also to notify PHYSICIANS of the improperly categorized and labeled Kindred LTAC claims submitted by GALLAGHER.

28. As KERN continued to explore the extent of its loss due to GALLAGHER's unauthorized actions, KERN became concerned that other claims handled by GALLAGHER may be implicated. Thus, KERN requested that GALLAGHER enter into a Tolling and Standstill Agreement to avoid having KERN immediately file an action against GALLAGHER. Ultimately, GALLAGHER's general counsel assigned a law firm to work with KERN to execute a Standstill, Tolling and Confidentiality Agreement ("Tolling Agreement") that became effective November 24, 2025.

29. The Tolling Agreement ultimately was extended to September 15, 2026, with a gap

between July 2, 2026, and July 18, 2026. Under the Tolling Agreement, both KERN and GALLAGHER could file an action regarding their dispute any day after September 15, 2026.

30. PHYSICIANS rejected KERN's appeal for payment of over $7,600,000 in covered Kindred LTAC claims. In a written communication with KERN dated January 26, 2026, in response to a further appeal and a request for the specific reasons why PHYSICIANS had denied the claims, PHYSICIANS's counsel stated that based on information provided by GALLAGHER through IOA, PHYSICIANS was not required to pay those claims because they were for "Rehab" services, and "Rehab" services are not covered. Given GALLAGHER's representations, PHYSICIANS also claimed that the PHYSICIANS Policy needed to be reformed to reflect GALLAGHER's representations. An endorsement to this effect was needed, PHYSICIANS counsel argued, because the PHYSICIANS Policy did not contain an exclusion for Kindred LTAC claims. PHYSICIANS counsel stated:

> *"[GALLAGHER] represented to IOA that [Kindred LTAC] claims were excluded as Kindred is a 'Rehab' facility and 'Rehab is not covered'" (citing to the email exchange set forth above.)*

In addition, PHYSICIANS counsel stated:

> *"[PHYSICIANS] acknowledges that LTAC services are eligible expenses under Section 2.9 of the Agreement. However, [KERN], through its reinsurance broker, advised IOA that Kindred claims were to be considered 'Rehab' and not LTAC. [PHYSICIANS] entered into the Agreement in reliance on this representation."*

PHYSICIAN's counsel added further that:

> *"Contemporaneously with this communication, [PHYSICIANS] is reforming the Agreement to reflect the intent to IOA by [KERN's] agent, [GALLAGHER], that all Kindred charges be considered 'Rehab' and 'not covered.'"*

31. In May 2026, KERN and GALLAGHER agreed to present their dispute before a neutral mediator. That mediation took place on June 16, 2026, and failed to resolve the dispute. A subsequent mediation in August 2026 with KERN, GALLAGHER, and PHYSICIANS also failed.

**FIRST CAUSE OF ACTION: PROFESSIONAL NEGLIGENCE**

**(Against Arthur J. Gallagher Risk Management Services, LLC.)**

32. KERN hereby incorporates by reference paragraphs 1 through 31 as though fully set forth herein. Between 2016 and 2024, KERN retained GALLAGHER to provide reinsurance brokerage services, including the procurement of stop loss and excess-of-loss reinsurance and "boutique" claims

handling services for KERN's member claims.

33. As KERN's retained reinsurance broker, GALLAGHER owed KERN a duty of care, requiring it to exercise the knowledge, skill, and ability ordinarily exercised by other similarly situated reinsurance brokers.

34. GALLAGHER breached its professional duties to KERN by failing to exercise the requisite skill, care, and knowledge in performing reinsurance brokerage and claims handling services on behalf of KERN. GALLAGHER's breaches include, but are not limited to: (1) failing to bring the question posed by IOA in 2022 regarding Kindred LTAC claims to the attention of KERN; (2) failing to investigate whether Kindred provided covered LTAC services; (3) failing to obtain KERN's agreement that all Kindred LTAC claims were "not covered"; (4) failing to obtain KERN's agreement that the Kindred LTAC claims submitted were for "Rehab" services and thus "not covered"; (5) failing to consult KERN prior to advising PHYSICIANS during the procurement process for the PHYSICIANS Policy that all Kindred LTAC claims would not need to be covered; and (6) failing to consult KERN or obtain KERN's agreement to an allegedly lower premium for the PHYSICIANS Policy in exchange for Kindred's LTAC claims not being covered.

35. PHYSICIANS has taken the position that the basis for its decision to deny the qualifying Kindred LTAC claims was GALLAGHER's statement that they were "Rehab" claims and "not covered."

36. GALLAGHER's actions, malfeasance, conduct, representations, statements and/or omissions fell below the standard of care for comparable reinsurance brokers and claims handlers who do business in this community, especially those who offer specialized claims handling services. GALLAGHER's professional negligence was a substantial factor in causing KERN to suffer losses exceeding $7,600,000 based on the wrongful denial of the Kindred LTAC claims in the 2024 policy year. If GALLAGHER had not improperly advised PHYSICIANS, KERN would have received millions of dollars in covered Kindred LTAC claims.

37. As a direct and proximate result of GALLAGHER's acts and omissions complained of, KERN has suffered actual injury and damages in an amount to be proven at trial, but which are estimated to exceed $7,600,000.

///

**SECOND CAUSE OF ACTION: BREACH OF CONTRACT**

**(Against Arthur J. Gallagher Risk Management Services, LLC.)**

38. KERN hereby incorporates by reference paragraphs 1 through 37 as though fully set forth herein.

39. KERN retained GALLAGHER as its reinsurance broker, and GALLAGHER agreed to provide reinsurance brokerage services including: (1) claims-handling services, including submission of claims, review of claims decisions to maximize KERN's coverage, and assistance in appealing claims decisions as necessary to maximize coverage; (2) keeping KERN informed of GALLAGHER's communications with PHYSICIANS impacting coverage; (3) seeking KERN's authorization for statements made to PHYSICIANS impacting coverage; and (4) refraining from actions that would prejudice KERN's ability to maximize coverage under the PHYSICIANS Policy.

40. In the course of their business relationship, GALLAGHER breached its contract with KERN by failing: (1) to provide claims-handling services including submission of claims, review of claim decisions to maximize KERN's coverage and appealing claims decisions as necessary to maximize coverage; (2) to keep KERN informed of GALLAGHER's communications with PHYSICIANS impacting coverage; (3) to seek KERN's authorization for statements made to PHYSICIANS impacting coverage; (4) to refrain from actions that would prejudice KERN's ability to maximize coverage under the PHYSICIANS Policy.

41. KERN performed all of its duties and responsibilities under the GALLAGHER Reinsurance Broker Agreement.

42. As a direct and proximate result of GALLAGHER's breach of contract, KERN has suffered compensatory damages to be proven at trial, but which are estimated to exceed $7,600,000.

**THIRD CAUSE OF ACTION: BREACH OF THE DUTY OF**

**GOOD FAITH AND FAIR DEALING**

**(Against Arthur J. Gallagher Risk Management Services, LLC.)**

43. KERN hereby incorporates by reference paragraphs 1 through 42 as though fully set forth herein.

44. KERN presently brings this cause of action on behalf of itself as a consumer of

GALLAGHER's promised reinsurance brokerage services, including specialized claims handling services.

45. KERN is informed and believes that GALLAGHER committed acts amounting to a breach of its duty of good faith and fair dealing, including: (1) taking actions without authorization that have prejudiced KERN's ability to maximize coverage under the PHYSICIANS Policy; (2) failing to keep KERN fully informed of the representations it was making to PHYSICIANS in the procurement of the PHYSICIANS Policy; (3) failing to investigate whether the Kindred hospitals provided LTAC services, including the services that resulted in claims for KERN's members; (4) failing to correct its mistake in improperly classifying Kindred LTAC claims as "Rehab" claims and therefore "not covered" even after IOA had notified GALLAGHER that the Kindred facilities involved could be LTAC facilities.

46. As a direct and proximate result of GALLAGHER's breach of the duty of good faith and fair dealing, KERN has suffered compensatory damages to be proven at trial, but which are estimated to exceed $7,600,000.

**FOURTH CAUSE OF ACTION: BREACH OF WRITTEN CONTRACT**

**(Against Physicians Insurance, a mutual company.)**

47. KERN hereby incorporates by reference paragraphs 1 through 46 as though fully set forth herein.

48. On or about January 1, 2024, PHYSICIANS sold KERN the PHYSICIANS Policy, which provided coverage for claims during the period of January 1, 2024, through December 31, 2024 (**Exhibit A**). The contract was drafted by PHYSICIANS and contained no exclusion applicable to otherwise covered, properly coded Kindred LTAC claims exceeding the applicable deductible.

49. PHYSICIANS breached its contract with KERN by: (1) denying coverage and failing to pay for Kindred LTAC claims that exceeded the applicable deductible despite there being no exclusion in the PHYSICIANS Policy stating that Kindred LTAC claims were not covered; and (2) failing to grant KERN's appeal without any contractual basis.

50. KERN performed all its duties and responsibilities under the PHYSICIANS Policy, including, but not limited to, paying its premiums and timely filing of an appeal of PHYSICIANS's initial denial of payment for the Kindred LTAC claims.

51. As a direct and proximate result of PHYSICIANS's breach of contract, KERN has suffered compensatory damages to be proven at trial, but which are estimated to exceed $7,600,000.

**FIFTH CAUSE OF ACTION: DECLARATORY RELIEF**

**(Against Arthur J. Gallagher and Physicians Insurance)**

52. KERN hereby incorporates by reference paragraphs 1 through 51 as though fully set forth herein.

53. This Court is empowered to declare the rights and legal relations of the parties regardless of whether further relief is or could be claimed. A party may seek to have insurance contracts construed to obtain a declaration of rights, status, and legal relations under the insurance contract.

54. KERN is informed and believes, and on that basis alleges, that GALLAGHER disputes that it was negligent or breached its duties outlined above. GALLAGHER improperly represented to PHYSICIANS that the Kindred LTAC claims were "not covered" because they were "Rehab" claims even though the PHYSICIANS Policy contained no such exclusion. GALLAGHER also informed PHYSICIANS that it did not have to pay the Kindred claims that exceeded the deductible.

55. KERN is informed and believes, and PHYSICIANS acknowledges, that the Kindred LTAC claims were not excluded under the PHYSICIANS Policy and that LTAC claims are covered, but PHYSICIANS denied coverage based upon GALLAGHER's representations that Kindred LTAC claims were "not covered" because they were "Rehab" services and not LTAC services.

56. Based on the actual controversy and dispute between KERN and all DEFENDANTS, KERN seeks appropriate orders, relief, and declarations from the Court as to the eligibility of coverage for Kindred LTAC claims. A declaration is necessary at this time so that the parties' dispute may be resolved and they may be aware of their respective rights and duties.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff KERN demands judgment against DEFENDANTS as follows:

ON THE FIRST CAUSE OF ACTION

(Professional Negligence)

1. General and compensatory damages in an amount in excess of $7.6 million to be proven at trial, including loss of use of moneys and/or appropriate interest on all damages incurred by KERN.

2. Special damages according to proof.

3. Costs of suit.

4. For pre-judgment interest and all other interest to which KERN is entitled; and

5. Attorneys' fees.

6. For such other relief as the court deems proper.

ON THE SECOND CAUSE OF ACTION

(Breach of Contract)

1. Compensatory damages in an amount to be proven at trial, which is currently in excess of $7,600,000.

2. Costs of suit.

3. Pre-judgment interest and all other interest to which KERN is entitled;

4. Attorneys' fees.

5. For such other and further relief as the court may deem proper.

ON THE THIRD CAUSE OF ACTION

(Breach of Duty of Good Faith and Fair Dealing)

1. Compensatory damages in an amount to be proven at trial, which is currently in excess of $7,600,000.

2. Costs of suit.

3. Pre-judgment interest and all other interest to which KERN is entitled.

4. Attorneys' fees.

5. For such other and further relief as the court may deem proper.

ON THE FOURTH CAUSE OF ACTION

(Breach of Written Contract)

1. Compensatory damages in an amount to be proven at trial, which is currently in excess of $7,600,000.

2. Costs of suit.

3. Pre-judgment interest and all other interest to which KERN is entitled;

4. Attorneys' fees.

5. For such other and further relief as the court may deem proper.

ON THE FIFTH CAUSE OF ACTION

(Declaratory Relief)

1. Declaration that the Kindred LTAC claims for the period of January 1, 2024, through December 31, 2024 are covered under the PHYSICIANS Policy.

2. Declaration that GALLAGHER was professionally negligent and thus liable for the damages suffered by KERN.

3. That PHYSICIANS, GALLAGHER, or both, are liable for the loss of coverage for the covered LTAC claims.

4. Costs of suit.

5. Attorneys' fees.

6. Any other relief the Court deems appropriate, just or necessary.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: September 16, 2026

KENNADAY LEAVITT PC

*/s/ Patrick S. Foster*
TROY R. SZABO
PATRICK S. FOSTER
COREY D. MCCARTHY
KALEIGH J. ADAMS

Attorney for Plaintiff
KERN HEALTH SYSTEMS, INC.

Dated: September 16, 2026

BROWN LAW APC

*/s/ Lester O. Brown*
LESTER O. BROWN

Attorney for Plaintiff
KERN HEALTH SYSTEMS, INC.

# EXHIBIT A

PHYSICIANS INSURANCE

601 Union Street, Suite 500
Seattle, WA 98101
(800) 962-1399
www.phyins.com

# REINSURANCE AGREEMENT

**(herein referred to as "Agreement")**

**Between**

**PHYSICIANS INSURANCE A MUTUAL COMPANY**

**Seattle, Washington**

**(herein referred to as "PI")**

**And**

**Kern Health Systems**

**Bakersfield, CA**

**(herein referred to as "Plan")**

**EFFECTIVE DATE: January 1, 2024**

**REINSURANCE AGREEMENT NUMBER PIH1003-24**

Tax I.D. #77-0392231

## TABLE OF CONTENTS


| TITLE | ARTICLE |
|---|---|
| Reinsurance Coverage | 1 |
| Schedule | 2 |
| Definitions | 3 |
| Reinsurance Premium | 4 |
| Additional Limitations | 5 |
| Notice of Claims and Reimbursement | 6 |
| Reports, Records and Audits | 7 |
| Effective Date, Duration and Termination | 8 |
| General Provisions | 9 |
| Experience Refund | 10 |
| Aggregating Specific Retention | 11 |

## ARTICLE 1

### Reinsurance Coverage

1.1 **Insuring Clause.** The Plan will cede to PI and PI will reinsure the Percentage Payable of Eligible Expenses Incurred per Member per Contract Year that exceed the applicable attachment point, up to any applicable maximums for specified Lines of Business, subject to all the terms of this Agreement. When applicable, reimbursement is based on the situs of Plan and/or the date the Eligible Expenses were Incurred.

1.2 **Carryforward:** Eligible Expenses may include expenses Incurred by a Member in the last 31 days of an Agreement issued to the Plan by PI or the Plan's prior reinsurer immediately preceding this Agreement if the applicable attachment point was not reached with respect to that Member under that preceding Agreement.

## ARTICLE 2
### Schedule

2.1 Contract Term: January 1, 2024 to December 31, 2024

2.2 Eligible Expense Basis:

- A. Claims Incurred Period: January 1, 2024 to December 31, 2024
- B. Claims Paid Period: January 1, 2024 to December 31, 2025
- C. Claim Reporting Deadline: January 1, 2024 to December 31, 2025
- D. Claim Submitted Period: January 1, 2024 to December 31, 2025

2.3 **LINE(S) OF BUSINESS: Medicaid**

Eligible Services incurred by Kern Health Systems are covered under this Agreement for Medicaid.

Self-funded employees are not covered under this Agreement, unless they are employees for which the Plan has risk, and they are specifically listed above as a Line(s) of Business.

2.4 **MONTHLY PREMIUM PER MEMBER:**

| Line(s) of Business | Combined | Number of Members |
|---|---|---|
| Medicaid SPD | $0.28 | 25,515 |
| Medicaid Non-SPD | $0.28 | 395,493 |

Annual Minimum Premium Requirement: $250,000

2.5 **ATTACHMENT POINT(S) PER MEMBER:**

| Line(s) of Business | Combined |
|---|---|
| Medicaid SPD | $350,000 |
| Medicaid Non-SPD | $350,000 |

*Member MEM0456878 is excluded from coverage.
*Member MEM0900726 is subject to a $650,000 Attachment Point.
*Member MEM0861133 is subject to a $800,000 Attachment Point.

2.6 **INDIVIDUAL CONTRACT YEAR MAXIMUM:** $2,000,000

2.7 **PERCENTAGES PAYABLE**........................................................................................ 90%

2.8 **ELIGIBLE EXPENSE LIMITATIONS PER MEMBER:** Eligible Expenses are limited to the lesser of:

A. The amount paid.
B. Any other limits shown in this Agreement.

2.9 **INPATIENT HOSPITAL SERVICES (Including LTAC):**

Eligible Expenses for Inpatient Hospital Services are also limited to the following Average Daily Maximum (ADM):

| **Average Daily Maximum** | |
|---|---|
| Bakersfield Memorial Hospital | $2,000 |
| Delano Regional Hospital | $2,000 |
| Kern Medical Center | $2,000 |
| Kern Valley Hospital | $2,000 |
| Tehachapi Hospital | $2,000 |
| All Other | $6,000 |

2.10 **SUB-ACUTE FACILITY SERVICES, INCLUDING PHARMACEUTICALS:**

| **Eligible Expenses that are for:** | **Limitation:** |
|---|---|
| Sub-Acute Facility Services | Not Covered. |

2.11 **OUTPATIENT FACILITY SERVICES:** Not Covered – Unless related to Transplant valuation phase.

2.12 **HOME HEALTH CARE:** Not Covered

2.13 **PROFESSIONAL CARE:**

| **Eligible Expenses that are for:** | **Limitation:** |
|---|---|
| Professional Care (related to Transplant during Transplant confinement only) | • The contracted amount<br>• 100% of 2024 RBRVS locally adjusted for Locality #99 (rest of California)<br>• 100% of Medicare Allowable<br>• Unlisted services the lesser of the amount paid or billed.<br>• Coverage includes the evaluation phase of the transplant. |

2.14 **HOSPICE CARE:** Not Covered

**2.15 PHARMACEUTICALS:**

| Eligible Expenses that are for: | Limitation: |
|---|---|
| Pharmaceuticals received in all settings | Included in all valuations listed above. |
| Gene & Cell Therapy | Excluded |

**2.16 ALL OTHER ELIGIBLE EXPENSES:**

| Eligible Expenses that are for: | Limitation: |
|---|---|
| Organ & Tissue Transplants | • Included within valuations above. ADM is waived for Transplant Confinement that is paid at a fixed fee or Medicaid DRG.<br>• Network Access Fees will be considered Eligible Expenses if one of the following is met:<br>  • Incurred and subject to a Transplant Network Vendor contract.<br>  • Incurred and subject to a contract negotiated by the Reinsured, approved and on file with the underwriter.<br>• Transplant Acquisition Expense – up to $10,000 per transplant contract period. If, however, Transplant Acquisition Expense is part of a fixed fee case rate, the $10,000 limit will be waived. |

**ARTICLE 3**

**Definitions**

3.1 **AMBULANCE:** Transportation for an emergency or from one Facility to another Facility.

3.2 **AVERAGE DAILY MAXIMUM ("ADM"):** The average expense per day for Inpatient Hospital Services during the Contract Year.

3.3 **BLOOD PRODUCTS:** Blood products, including blood clotting factors, derived from blood or recombinant (synthetic) sources and used to treat serious conditions, including blood clotting disorders. Blood clotting factors include, but are not limited to, Factor VIIa (recombinant), Factor VIII (human, porcine, recombinant), Factor IX (nonrecombinant and recombinant), and von Willebrand Factor.

3.4 **CAPITATED SERVICE(S):** Services performed for a Member by a health care provider with whom the Plan has a contract, directly or indirectly, and where the contract transfers from the Plan the entire risk (without any stop loss or other risk retention by the Plan) that the service may generate a cost greater than the capitation payment.

3.5 **CHEMOTHERAPY:** Chemotherapy drugs (as indicated in HCPCS book for codes J9000-J9999 or any replacement codes or an equivalent NDC code) and any medications used to treat cancer or the side effects of chemotherapy.

3.6 **CONTRACT YEAR:** The period that begins on the Effective Date and ends upon the earlier of 12 months beyond the Effective Date or the termination of this Agreement.

3.7 **COST CONTAINMENT PROGRAM:** A program recommended by PI that is designed to improve quality and reduce or control the cost of providing health care services and supplies under the Covered Plan. This includes, but is not limited to, bill audits, specialty care management, provider rate negotiations and access to provider networks.

3.8 **CUSTODIAL CARE:** Services and supplies provided to a Member that are for maintenance, not mainly rehabilitative or restorative, or mainly to assist in the activities of daily living (such as help in eating, getting out of bed, bathing, dressing, toileting, or taking drugs). Custodial Care does not include Hospice Care.

3.9 **DIALYSIS:** Process by which toxic substances are removed from the blood artificially when the kidneys have failed (renal failure).

3.10 **DURABLE MEDICAL EQUIPMENT ("DME"):** Medical equipment ordered by a health care provider including, but not limited to, orthotics, prosthetics, or implants.

3.11 **ELIGIBLE EXPENSE(S):** Expenses for health care services and supplies provided to a Member that are Incurred during the Contract Year and are:

A. Covered by the Membership Service Agreement as the responsibility of the Plan to provide to a Member; and

B. Shown on the attached Eligible Expenses Matrix(ces) as an Eligible Expense under this Agreement; and

C. Performed by a Plan participating provider; or performed by a nonparticipating provider utilized (1) due to a referral by the Plan, (2) due to an emergency, or (3) due to the Member being inpatient confined on the date they became a Member; and

D. Not excluded under this Agreement.

E. When approved by the PI, Eligible Expenses may also include vendor fees Incurred by the Plan.

F. **Carryforward:** Eligible Expenses may include expenses Incurred by a Member in the last 31 days of an Agreement issued to the Plan by PI or the Plan's prior reinsurer immediately preceding this Agreement if the applicable Attachment Point was not reached with respect to that Member under that preceding Agreement.

3.12 **ELIGIBLE EXPENSE MATRIX(CES):** The attached forms listing:

A. Which services and supplies meet part B of the definition of Eligible Expense, and which do not; and

B. Which services and supplies apply to each attachment point, if this Agreement has more than one attachment point.

3.13 **EMERGENCY OUT-OF-AREA SERVICES:** Services provided to a Member, that are due to an emergency and are provided outside the Plan's service area. An emergency exists when there is a sudden onset of illness or accidental injury occurring while the Member is outside the service area of the Plan:

A. Requiring such immediate treatment that the life or health of the Member might be jeopardized if taken to a hospital, physician or surgeon within the service area; or

B. When the Member is incapable of making the decision on treatment.

For Emergency Out-of-Area Services to be eligible for coverage, the Member must reside in the Plan's service area for at least seven (7) months of each year and return to the service area as soon as medically stable and authorized for transfer.

3.14 **FACILITY(IES):** Any hospital, specialized medical institution, skilled nursing facility or rehabilitation facility, that bills for its services and supplies on form CMS-1450 or any form that replaces this form.

3.15 **FIXED FEE:** The per diem or per case rate the Plan paid a Facility for health care services and supplies. Fixed Fee excludes:

A. The per diem or per case rate if the entire payment reverted to a discounted rate once an outlier or stop loss level was reached; or

B. Any amounts that exceeded an outlier or stop loss level that the Plan paid at a discounted rate; or

C. Any payment that included billed charges as part of its calculation.

3.16 **HOME HEALTH CARE:** The subset of medically necessary health care services and supplies that are mainly rehabilitative or restorative in nature and are for treatment of a Member in a home setting. Home Health Care does not include Custodial Care.

3.17 **HOSPICE CARE:** Comprehensive package of services:

a. provided by health care providers who are Medicare-certified and have a current state Hospice license.
b. offered as palliative care support to an individual who has a medical prognosis with a life expectancy of six months or less and his/her family.
c. provided in the home or a Facility.
d. focused on holistic support and relieving pain and other symptoms during the terminal illness.

Hospice Care does not include Inpatient Hospital Services, Sub-Acute Facility Services, Long Term Acute Care, Home Health Care, Professional Care, or Custodial Care.

3.18 **INCURRED:** The date the services or supplies to which the expense relates are provided.

3.19 **INDIVIDUAL CONTRACT YEAR MAXIMUM:** The maximum liability of PI, per Member under this Agreement per Contract Year as indicated by the amount specified in the Schedule.

3.20 **INJECTABLES:** Drugs other than oral medications (as indicated in HCPCS book for codes J0001-J8999 and Q codes or any replacement codes or any NDC equivalent codes) for non-chemotherapy medications, excluding clotting factors (J7190-J7199) and Blood Products.

3.21 **INPATIENT HOSPITAL SERVICES:** The subset of medically necessary services and supplies for treatment of a Member for the period where:

A. The Member is a registered inpatient in a Facility; and

B. The Member is receiving daily evaluation and treatment from a licensed physician or registered nurse under the supervision of a licensed physician; and

C. PI determines, using reasonable guidelines, that the Member's care:

1) would qualify for inpatient hospital acute medical care (medical, surgical, intensive care units); and
2) is not care solely for intensive, acute, or other rehabilitation.

Inpatient Hospital Services does not include Professional Care but does include the infusion of bone marrow or peripheral blood stem cells in an outpatient setting during a Transplant Confinement.

3.22 **INSOLVENT or INSOLVENCY:** The later date of either of the following, provided both occur:

A. The date that a court of competent jurisdiction formally and finally declares the Plan is insolvent; and

B. The date that all operations of the Plan cease. Operations will be considered to cease when the court appointed Receiver:

1) stops paying for any further services; and
2) publicly declares that it will not make payment for any further services; and
3) orders Plan providers to stop rendering services on behalf of the Plan other than for those services for the remaining term for which providers have previously been paid, or for which providers are otherwise obligated by law or contract.

3.23 **LONG TERM ACUTE CARE:** Comprehensive services for a Member who is a registered inpatient requiring specialized, complex services and is in a Long Term Acute Care Hospital. These services require daily physician monitoring and intensive nursing care, generally with a length of stay for 25 days or more. Examples include ventilator dependent patients and patients requiring wound care management, IV therapy, dialysis and telemetry.

Long Term Acute Care does not include Professional Care, Inpatient Hospital Services, Sub-Acute Facility Services, Hospice Care or Custodial Care.

3.24 **LONG TERM ACUTE CARE HOSPITAL (LTACH):** A Facility, or Hospital within a Hospital, licensed by the State as an LTACH.

3.25 **MATERIAL CHANGE:**

A. A change or combination of changes in a Membership Service Agreement, provider reimbursement levels, number of Members in a Line of Business increases or decreases, or the Plan's service area, that PI determines would increase expected aggregate reinsurance claims 5% or more; or

B. The Plan acquires the assets of another company or foundation or merges with or comes under control of another person, company or foundation; or

C. Any change in senior operating management, any fundamental change in its management service contract, or any change in majority ownership of the Plan.

Material Changes require notification (Article 7), and may be excluded (Article 5) or result in premium changes (Article 4) or termination (Article 8).

3.26 **MEDICARE ALLOWABLE:** Fees set by Medicare.

3.27 **MEMBER:** A person or dependent enrolled by the Plan and eligible to receive services under a Membership Service Agreement.

3.28 **MEMBERSHIP SERVICE AGREEMENT(S):** Those contractual agreements between the Plan and its Members for those specified Lines of Business listed in Article 2, that are made a part of this Agreement.

3.29 **OUTPATIENT FACILITY SERVICES:** Services and supplies provided by a Facility to a Member who is not a registered inpatient in that Facility.

3.30 **PHARMACEUTICALS:** Blood Products, Chemotherapy, Injectables, and prescription medications dispensed by a retail pharmacy.

3.31 **PROFESSIONAL CARE:** Services and supplies, including medical, surgical, diagnostic, therapeutic, and preventative services provided to a Member by any health care professional,

paraprofessional or facility that bills on a form CMS-1500 or on a form CMS-1450 (for revenue codes 960–989), or any form that replaces these forms. Professional Care does not include Home Health Care.

3.32 **PROVIDER GROUP(S):** The entity(ies) named on the Schedule.

3.33 **SUB-ACUTE FACILITY SERVICES:** The subset of medically necessary health care services and supplies that are mainly rehabilitative or restorative in nature and are for treatment of a Member when the Member is a registered inpatient in a Facility. Sub-Acute Facility Services does not include Custodial Care or Professional Care.

3.34 **TRANSPLANT:** A surgical procedure in which a dysfunctional organ is replaced by a functional human organ from either a deceased or living donor or the infusion of bone marrow or peripheral blood stem cells to reconstitute the immune system following preparative regimens of chemotherapy administered to treat disease.

3.35 **TRANSPLANT ACQUISITION EXPENSE:** Search fees and expenses to remove (from either a deceased or living donor), preserve, and transport a donated organ, bone marrow, or peripheral stem cells.

3.36 **TRANSPLANT CASE RATE:** The rate that is negotiated for a Transplant for a defined number of days. When per diem outliers until discharge are negotiated, the Transplant Case Rate will include such per diem outliers.

3.37 **TRANSPLANT CONFINEMENT:** The period of time for which the Transplant Case Rate applies or, if there is no Transplant Case Rate, the period of time that begins one day prior to the Transplant and ends upon hospital discharge or on the date of the Transplant and ends 40 days later for outpatient bone marrow and peripheral stem cell transplants.

3.38 **TRAVEL EXPENSE:** Commercial transportation to and from the site of a Transplant and lodging and meals costs of the Member receiving the Transplant and his/her companions, when the Member resides more than 50 miles from the Transplant site and when the Member receives a Transplant during the Contract Year.

## ARTICLE 4

### Reinsurance Premiums

4.1 **Premium Rate.** The premium rate in the Schedule is payable monthly and is based on the number of Members enrolled during the month as of the first day of each month. Additional premium may be charged based on a Material Change if PI notifies the Plan of the change in premium within 30 days of PI being notified of the Material Change.

Plan shall submit to PI with each premium payment a statement which lists as accurately as possible the number of Members in the Plan for that month and which adjusts the prior month's report to reflect the actual number of Members in the Plan for such prior month.

4.2 **Due Date.** Premiums are due no later than the first day of the month for the month which reinsurance coverage is to be provided. All premiums are payable to PI at its Home office in Seattle, Washington, or at any other place specific by PI.

4.3 **Grace Period.** There is a grace period of 31 days after the due date to pay the premium. If premium is not received before the end of the grace period, PI may issue written notice of termination for non-payment under Article 4.4.

4.4 **Written Notice of Termination.** In the event that the Plan fails to pay any premium due hereunder, PI will provide the Plan with ten days written notice of termination for non-payment. If the Plan fails to respond during this period, this Agreement shall automatically terminate at the end of the ten-day period.

4.5 **Reinstatement.** PI may, at its sole discretion, agree to reinstate cover under this Agreement as of the effective date of termination upon payment of all outstanding premiums. PI may require Plan to supply information for underwriting purposes prior to considering whether rot grant reinstatement.

## ARTICLE 5

### Additional Limitations

5.1 **Obligations.** This is an Agreement solely between and solely benefiting the Plan and PI. The parties intend no benefit by this Agreement to creditors, Members, or health care providers. The Plan is responsible for all health care and health care expenses for Members. PI has no obligation to provide any service or payment, directly or indirectly, to anyone but the Plan.

5.2 **Coordination of Benefits/Subrogation.** If the Plan receives or will receive any payment or reduction in expense by reason of a coordination of benefits provision in the Membership Service Agreement or by any right of subrogation, that payment or reduction is a reduction in Eligible Expenses. If PI has already paid a claim that included these Eligible Expenses, the Plan will reimburse PI the amount of this reduction.

5.3 **Multiple Policies.** If Plan has another Agreement insuring the same risk assumed under this Agreement for these same Lines of Business, PI will pay only the pro rata portion of the amount otherwise payable under this Agreement, subject to the Agreement maximums and limitations.

5.4 **Additional Limitations.** PI is not liable to the Plan, and the Plan will hold harmless and indemnify PI, for the following:

A. Amounts in excess of the maximums set forth in this Agreement or limitations shown in the Schedule.

B. Professional liability or liability for any act or omission, tortious or otherwise, in connection with any services for any person or group of persons by the Plan or any group, entity, or person employed by or contracted with the Plan.

C. Extracontractual damages or liability of the Plan in excess of Plan's Membership Service Agreements.

D. Medical expenses due to declared or undeclared war.

E. Expenses that the Plan has not paid or Capitated Services unless listed under specified Lines of Business in Article 2.

F. Additional liability of PI caused by a Material Change, unless PI expressly accepts the Material Change.

G. Expenses for an illness or injury for which the Member is eligible for benefits from, or receives benefits from, a workers compensation, occupational disease, or similar government law.

H. Liabilities, expenses, or losses that are based upon any noncompliance or violation of any Federal or State statute, rule, or regulation by the Plan.

I. Treatment, services or supplies that are listed as "Not Covered" on the attached Eligible Expense Matrix(ces).

J. Any liability arising from any benefit denial or restriction made by the Plan, or arising from any product design or advertising of the Plan.

# ARTICLE 6

## Notice of Claims and Reimbursement

6.1 **Written Notice of Claim.** The Plan shall provide PI written notice of any claim or potential claim that it may assert under this Agreement within 31 days from the date on which the claim or potential claim is incurred. The Plan shall promptly report to PI the names and claim amounts for those Members who have received Eligible Expenses that exceed 50% of the attachment point or who have certain diagnosed conditions as referenced under Article 2.3.

6.2 **Claim Forms.** Upon written request, PI will furnish Plan with a supply of claim forms to be used in filing a claim. If such forms are not supplied to the Plan within 15 days after notice of a claim, PI must accept the filing of the proof-of-loss covering the occurrence, character, and extent of loss for filing the claim.

6.3 **Proof of Loss.** The Plan must file a completed proof of loss within twelve months from the end of the Contract Year in which the claim was incurred for all initial submissions and all subsequent submissions. PI shall not be liable for any claim for which it has not received a completed proof of loss within twelve months from the end of the Contract Year in which the claim was incurred. A claim is deemed to be received on the date it is mailed by the Plan. A completed claim form must be accompanied by copies of the various bills or a report outlining all details of the actual bills; itemized expenses involved including the payment or allowed amounts; and proof of eligibility. Except that all claims must be submitted to PI within 90 days following the date the Agreement is terminated by PI.

6.4 **Loss of Coverage.** There is no coverage of an Eligible Expense when:

a. PI does not receive a completed report of Early Notification Form or other form designated by or acceptable to PI related to the Eligible Expense, prior to twelve (12) months after the end of the Contract Year; and

b. PI does not receive the following information related to the Eligible Expense prior to ten (10) months after the end of the Contract Year:

1. a completed claim form;
2. proof of eligibility; and
3. a claim detail report (for the required fields of information, contact your claim representative).
4. any other documentation PI reasonably deems necessary to properly determine the reinsurance payable. This includes, but is not limited to, copies of the completed CMS -1450 or CMS-1500, or if electronically billed by a provider, a copy of the electronic submission.

However, this limitation does not apply to Eligible Expenses if prior to twelve (12) months after the end of the Contract Year Plan has in writing pursued a right by coordination of benefits, subrogation or otherwise to recover or reduce such expenses, and has notified PI within 30 days of such action.

6.5 **Payment of Claims.** All benefits payable under this Agreement will be paid within 30 days after PI receives all information required to determine liability under the terms of this Agreement. Unless indicated differently in the Eligible Expense Matrix, claims for Eligible Expenses submitted

on a CMS-1450 or UB-04 will apply to the hospital attachment point and those submitted on a CMS-1500 will apply toward the physician attachment point.

6.6 **Appeal of Claim Determination.** The Plan must submit a written request for review of any claim processed under this Agreement within 2 years after receipt of a claim determination. This request must include the specific reason for the review.

6.7 **Refund of Overpayments.** If, following a claim audit, PI determines that the Plan has been overpaid, the Plan will promptly refund such overpayment to PI upon demand. A claim audit may take place during the time this Agreement is in effect and for a two-year period after the termination of the Agreement.

## ARTICLE 7

### Reports, Records and Audits

7.1 **Notice of Material Change.** The Plan will give written notice to PI of any Material Change no later than 30 days after the Material Change.

7.2 **Financial Statements.** The Plan acknowledges that its financial stability is important to the management of the reinsurance risk. Accordingly, the Plan will submit to PI a copy of its statutory and GAAP quarterly financial statements within 45 days following the end of any quarter. The Plan will also submit to PI a copy of its Risk Based Capital Report within 75 days following the end of the calendar year.

7.3 **Notice of Supervision by the State.** If the Plan is placed under supervision by the state, the Plan will give written notice to PI within 15 days.

7.4 **Enrollment.** The Plan will keep a record of the monthly enrollment of Members covered by its Membership Service Agreements and the Eligible Expenses for each Member while covered under this Agreement. Such record will be kept during the time this Agreement is in effect and for a three (3) year period after its termination date or for the period during which claims are pending, whichever is longer.

7.5 **Books and Records.** The Plan's books, records, and Membership Service Agreements will be made available to PI for inspection and audit at any time during normal business hours while this Agreement is in effect and for a three (3) year period after its termination date or for the period during which claims are pending, whichever is longer.

7.6 **Notice of Investigation.** The Plan will give written notice to PI of any investigation or request for information of a material nature (not including routine reports and requests), by a regulatory agency regarding the conduct of the Plan. Such written notice must be provided by the Plan to PI within 30 days following the date the Plan receives notice, written or otherwise, of such investigation or request.

## ARTICLE 8

### Effective Date, Duration and Termination

8.1 **Effective Date.** This Agreement is effective on the date indicated on the face page.

8.2 **Termination.** This Agreement terminates on the earliest of the following:

A. Nonpayment of premium as set forth in the Reinsurance Premium provisions.

B. The date a petition is made for a declaration of receivership or rehabilitation of a party, or the date a party ceases operations.

C. The date of a Material Change if PI notifies the Plan of termination for this reason within 30 days of PI being notified of the Material Change.

D. The end of the Contract Year.

E. Upon the date of a material breach of this Agreement. The party terminating for this reason must give the other party notice of the actions or inactions that constitute the breach and 5 business days to cure the breach to the satisfaction of the notifying party.

8.3 **Termination of Rights.** Termination of this Agreement does not affect the rights and liabilities of the Plan or PI arising during any period when this Agreement was in effect. However, this does not extend liability of PI for expenses that are Incurred after the termination of this Agreement.

8.4 **Insolvency.** In the event of the insolvency of the Plan all Reinsurance will be payable directly to the liquidator, receiver, or statutory successor of the Plan, on the basis of the liability of Plan in this Agreement without diminution due to the insolvency of the Plan.

## ARTICLE 9
### General Provisions

9.1 **Entire Agreement.** This document, any attached endorsements, the Eligible Expense Matrix(ces), any Disclosure Statement and any documents incorporated by reference constitute the entire Agreement between the Plan and PI.

9.2 **Misstated Data.** If information material to the underwriting of the Agreement is misstated or omitted, PI may retroactively adjust the premiums or coverage in accordance with the correct data.

9.3 Agreement Changes. This Agreement may be amended by mutual written consent of officers of the Plan and PI.

9.4 **Assignment.** This Agreement and any amounts payable under this Agreement are not assignable.

9.5 **Waiver.** Waiver of any provision of this Agreement is not a waiver of that provision or other provisions at a later date.

9.6 **Right of Offset.** Amounts owed by the parties to each other, with respect to this Agreement may be offset and then only the balance will be owed. The right of offset will not be affected or diminished because of the insolvency of either party.

9.7 **Clerical Error.** If either party fails to comply with a provision of this Agreement because of an error, the underlying status of this Agreement will not be changed so long as the error is rectified as soon as possible after discovery. Then both parties will be restored to the position they would have occupied had such error not occurred. An error is an inadvertent clerical mistake. It does not include errors in judgment, errors that expand the definition of Membership Service Agreement or reduce the effect of the limits in this Agreement, negligent acts, and repetitive errors in administration, or other errors. Neither party may invoke a right to rectify its error after 12 months after the end of the Contract Year.

9.8 Personal Information. Confidentiality:

A. Personal Information means nonpublic personal information as described in Title V of the Gramm Leach Bliley Act and protected health information as described in privacy regulations of the Department of Health and Human Service (HHS) that may be identified with a Member and that PI obtains.

B. PI may use Personal Information to underwrite and perform terms of this Agreement and in other ways permitted by applicable privacy laws. PI will:

1) use safeguards to prevent nonpermitted use or disclosure; and

2) restrict access to only those employees involved in the permitted uses; and

3) report to the Plan any nonpermitted use or disclosure of which it becomes aware; and

4) make Personal Information and related records available as described in privacy regulations of HHS.

PI may disclose Personal Information to a person assisting in permitted uses if that person agrees in writing to be bound to terms similar to Article 9.8.

C. Article 9.8 does not apply if:

1) the Personal Information is available to the public other than as a result of any disclosure by PI or its representatives; or

2) the Personal Information was available to PI or its representatives on a nonconfidential basis before it was obtained for uses permitted in Article 9.8; or

3) the Plan and the Member consent in writing to the disclosure; or

4) the law requires disclosure.

D. PI will destroy Personal Information, if feasible, after seven years after this Agreement terminates.

E. PI agrees that money may be an inadequate remedy for a breach of Article 9.8 and agrees to not object to an injunction for this breach.

9.9 **Binding Arbitration.** If any dispute arises out of or relates to this Agreement or its breach, termination or validity, the parties agree that first, senior management will try in good faith to settle the dispute. If they do not reach a solution within 90 days, the dispute will be settled by arbitration administered by the American Arbitration Association ("AAA") according to its Commercial Arbitration Rules. The parties will each pay the costs of its counsel, witnesses, experts and proofs. The parties will share the cost of the arbitration administration. The arbitrator may award specific performance, rescission, or monetary damages in an amount that does not include punitive or other damages in excess of contractual damages.

## ARTICLE 10

### Experience Refund

10.1 **Experience Refund.** If PI issues the Plan an Agreement subsequent to this Agreement that provides coverage for an additional Contract Year and coverage is continuous from the effective date of this Agreement through the entire Contract Year of the subsequent Agreement, the premium for this Agreement provides for an experience refund of 20% of PI's net profit for this Agreement, if any.

10.2 **Net Profit.** The net profit is calculated as follows:

A. The sum of all premiums paid by the Plan for coverage under this Agreement; minus

B. The sum of all expenses Incurred by PI that are equal to 50% of premium paid by the Plan for this Agreement; minus

C. The sum of all reinsurance claims paid by PI under this Agreement.

10.3 **Calculation of Refund.** PI will calculate and distribute to the Plan any experience refund 13 months after the end of the Contract Year.

## ARTICLE 11

### Aggregating Specific Retention

This Article is effective on the Inception Date of the Agreement and will end on the Expiration Date, as set forth in Item 2.1 of Article 2, unless otherwise terminated.

PI and Kern Health Systems agree to the following:

Aggregating Specific Retention (ASR) is calculated as an amount equal to the sum of:

1. $0.20 per Member Per month

The Aggregating Specific Retention will be retained by Kern Health Systems and used to self-fund the first layer of eligible Claims incurred. The Claims will still be processed by PI and applied against the ASR pool. Once the eligible Claims exceed the ASR pool, PI will make claim payments.

This Agreement will automatically terminate at the end of the Contract Year (Article 8).

IN WITNESS WHEREOF, the Plan and PI have, by their respective officers, executed and delivered this Agreement, in duplicate effective from the date set out on the face page of this Agreement.

KERN HEALTH SYSTEMS

Dated: 06/04/2024 By: ROBERT LANDIS

Attest: [redacted] Title: CHIEF FINANCIAL OFFICER

PHYSICIANS INSURANCE A MUTUAL COMPANY

Dated: 6/18/2024 By: [redacted]

Attest: ______ Title: Chief Financial Officer

RE

## IOA Re DISCLOSURE STATEMENT

**Name:** Kern Health Systems Agreement Term: 1/1/2024 to 1/1/2025

Please provide the following information, if not applicable, please indicate N/A on the disclosure statement below:

1. Updated 50% claim report with dates of services through the date of binding.
2. Members on a transplant list or diagnosed with the need for a transplant.
3. Members receiving high cost pharmaceuticals or clotting factors that are expected to exceed $50,000 per year.
4. Any member expected to exceed 50% of the selected retention.
5. A facility confined report which captures members who have incurred 10 or more confined days as of the date of binding or the effective date, whichever is later. If coverage is bound after the effective date, please provide a daily facility confined report which captures members who have incurred 10 or more confined days for each day from effective date through the date of binding.
6. List of members diagnosed with spinal muscular atrophy (SMA), which includes the SMA type, date of birth, prognosis, and the anticipated annual paid amount.
7. List of members diagnosed with hemophilia B, date of birth, prognosis, and the anticipated annual paid amount.

Please see information sent from our clinical department

[redacted]

Authorized Representative

12/18/23

Date

Robert Landis CFO

Name and Title (please print)

PHYSICIANS INSURANCE

601 Union Street, Suite 500
Seattle, WA 98101
(800) 962-1399
www.phyins.com

## Eligible Expense Matrix

**Plan:** Kern Health Systems
**Agreement Number:** PIH1003-24
**Contract Year:** January 1, 2024 through December 31, 2024

**Lines of Business:** Medicaid/Medicaid SPD

**Inpatient Hospital Services** ☒ **Included** ☐ **Not Included**

Attachment point ☐ Hospital ☐ Physician ☒ Combined

**Sub-Acute Facility Services** ☐ **Included** ☒ **Not Included**

**Long Term Acute Care** ☒ **Included** ☐ **Not Included**

Attachment point ☐ Hospital ☐ Physician ☒ Combined

**Outpatient Facility Services** ☒ **Included** ☐ **Not Included**

Expenses not covered:

- Outpatient Facility Services except when related to Transplant Evaluation phase.

**Home Health Care** ☐ **Included** ☒ **Not Included**

**Professional Care** ☒ **Included** ☐ **Not Included**

Expenses not covered:

- Professional Care except when related to Transplant Confinement.

**Hospice Care** ☐ **Included** ☒ **Not Included**

| | | | |
|---|---|---|---|
| **Pharmaceuticals** | ☒ **Included** | ☐ **Not Included** | |
| Inpatient Hospital Services | ☒ **Included** | ☐ **Not Included** | |
| Attachment point | ☐ Hospital | ☐ Physician | ☒ Combined |
| Sub-Acute Facility Services | ☐ **Included** | ☒ **Not Included** | |
| Long Term Acute Care | ☒ **Included** | ☐ **Not Included** | |
| Attachment point | ☐ Hospital | ☐ Physician | ☒ Combined |
| Outpatient Facility Services | ☒ **Included** | ☐ **Not Included** | |

Expenses not covered:

- Outpatient Facility Services except when related to Transplant evaluation phase.

| | | |
|---|---|---|
| Home Health Care | ☐ **Included** | ☒ **Not Included** |
| Professional Care | ☒ **Included** | ☐ **Not Included** |

Expenses not covered:

- Professional Care except when related to Transplant Confinement.

| | | |
|---|---|---|
| Hospice Care | ☐ **Included** | ☒ **Not Included** |
| Retail pharmacy | ☐ **Included** | ☒ **Not Included** |
| Self-administered drugs | ☐ **Included** | ☒ **Not Included** |
| **Ambulance** | ☐ **Included** | ☒ **Not Included** |
| **Durable Medical Equipment** | ☐ **Included** | ☒ **Not Included** |

Gallagher

Provider Stop Loss

## Claims Service Agreement – IOA Re

As a reinsured of IOA Re/Physicians Insurance A Mutual Company("Reinsurer"), Kern Health Systems ("Client") has specific obligations and duties to report and review claims, maintain information, and file appeals to Reinsurer according to set date parameters in the policy. It is Client's obligation to read and understand the policy in its entirety to determine all of the obligations, including those addressing Claims Reporting Requirements. Below are important dates in the policy.

| | From | To | Deadline for submission to reinsurer | Remit to Gallagher by |
|---|---|---|---|---|
| Claims Incurred Period | January 1, 2024 | January 1, 2025 | Not Applicable | Not Applicable |
| Claims Paid Period | January 1, 2024 | January 1, 2026 | December 31, 2025 | December 1, 2025 |
| Claims Reported Period | January 1, 2024 | January 1, 2026 | December 31, 2025 | December 1, 2025 |
| Claims Submitted Period | January 1, 2024 | January 1, 2026 | December 31, 2025 | December 1, 2025 |
| Claims Appeals Period | January 1, 2024 | Within 30 days of receipt of EOBs | To be Determined | To be Determined |

It is Client's sole duty to perform the requirements in the policy according to the timelines set above. Although Arthur J Gallagher Risk Management Services, LLC ("Gallagher") will assist Client in the filing, auditing and appeals of claims that fall within the policy parameters, these services are performed as a courtesy only and our services do not extend or alter coverage afforded or extend deadlines under the policy.

Claims and/or data that Client requests Gallagher submit to Reinsurer must be complete, fit the parameters in the policy and be remitted to Gallagher on or before the above date. Failure to supply this data in an appropriate format, in the sole discretion of Gallagher, may result in termination of the courtesy services. It is Client's responsibility to review the data in advance of submission to the Reinsurer. In no event will Gallagher be liable for any Claim reported or not reported to the Reinsurer.

From time to time, the Reinsurer, in its sole discretion, may request additional information from Client by specific deadlines, commonly referred to as Pended Claim Deadlines. If the Reinsurer requests additional information from Client on any Pended Claim and does not receive all requested information by the Pended Claim Deadline, Gallaghershall have no liability for such Pended Claim.

It is Client's duty and obligation to review all claims adjudications from the Reinsurer. If Client disagrees with the Reinsurer's adjudication of part or all of any Claim, Client must file an appeal within the above Appeal Deadline. The appeal must include identification of the appealed claim, the reason for the appeal and any supporting documentation to substantiate reconsideration. Gallagher will assist in filing these appeals but ultimately the obligation to make the decision to, carry out and finalize appeals lies with Client as the Insured.

In the event Gallagher ceased being broker of record for the subject policy or policies, Gallagher's services described herein will terminate. In such event, Client will be responsible for ensuring all claims are reported to and all appeals filed with the Reinsurer within the time periods required by the applicable policy.

Acknowledged and agreed to

By: [redacted] Date: 12/21/23
Signature of Authorized Representative of Client

Printed Name: Robert Landis

Arthur J. Gallagher Risk Management Services, LLC
License Number 0D69293